UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

LESLIE B.,                                    )
                                              )
                          Plaintiff,          )
                                              )
            v.                                )        No. 1:17-cv-01108-TWP-DLP
                                              )
NANCY A. BERRYHILL, Deputy                    )
Commissioner for Operations, Social           )
Security Administration,                      )
                                              )
                          Defendant.          )

## REPORT AND RECOMMENDATION

Plaintiff Leslie B.[1] requests judicial review of the denial by the Commissioner

of the Social Security Administration ("Commissioner") of her application for

Supplemental Security Income ("SSI") under Title II and XVI of the Social Security

Act ("the Act"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). For the reasons set forth below,

the Magistrate Judge recommends that the Commissioner's decision should be

**REVERSED** and **REMANDED** for further proceedings.

## I.    PROCEDURAL BACKGROUND

On January 30, 2013, the Plaintiff applied for Supplemental Security Income

benefits under Title II and XVI of the Social Security Act, originally alleging an

onset date of June 1, 2006, but later amending it to May 14, 2009. Her claim was

---

[1] The Southern District of Indiana has adopted the recommendations put forth by the Court
Administration and Case Management Committee regarding the practice of using only the first
name and last initial of any non-government parties in Social Security opinions. The Undersigned
has elected to implement that practice in this Order.

denied initially and upon reconsideration. The Plaintiff then filed a written request for a hearing on June 7, 2013, which was granted.

On July 10, 2014, Administrative Law Judge ("ALJ") B. Lloyd Blair conducted a hearing. The Plaintiff appeared and testified at this hearing, and a vocational expert ("VE") submitted answers to vocational interrogatories. Thereafter, on October 28, 2014, the ALJ held a supplemental hearing to cross examine the VE. On December 5, 2014, the ALJ issued an unfavorable decision denying Plaintiff benefits. The Appeals Council denied Plaintiff's request for review on July 13, 2015.

Plaintiff then sought judicial review of the ALJ's decision. After seeking judicial review, Plaintiff and the Commissioner submitted a joint motion to remand. The District Court granted the parties' motion to remand and ordered the ALJ to further evaluate Plaintiff's alleged symptoms, give further consideration to Plaintiff's maximum residual functional capacity, conduct further proceedings to determine whether a drug addiction is a contributing factor material to the finding of disability, and, if warranted, obtain evidence from a vocational expert.

On September 13, 2016, ALJ B. Lloyd Blair conducted another hearing where the Plaintiff and a new VE testified. On December 7, 2016, the ALJ issued another unfavorable decision, which is the agency's final decision for the purposes of judicial review. 20 C.F.R. § 404.984(a), (d). Plaintiff now seeks review of the Commissioner's decision. *See* 42 U.S.C. § 1383(c)(3).

## II.    STANDARD OF REVIEW

To prove disability, a claimant must show she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  To meet this definition, Plaintiff's impairments must be of such severity that she is not able to perform the work she previously engaged in and, if based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520. The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves her unable to perform her past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. A negative answer at any point, other than step three,

terminates the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520. The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id*. The Commissioner must then establish that the claimant—in light of her age, education, job experience and residual functional capacity to work—is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

The Court reviews the Commissioner's denial of benefits to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support, but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Plaintiff is disabled, but rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

In this substantial-evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir.2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the

Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues, *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also*, *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to his conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for his decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004).

The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel,* 227 F.3d at 872.

## III.   Discussion

### A. Factual Background

The Plaintiff was born on October 6, 1987 and was 28 years old at the time of her second hearing in September 2016. [Dkt. 11-22 at 34 (R. 1156).] She completed high school through the tenth grade and never received a GED (General Equivalency Diploma). *Id.* The Plaintiff does not have a driver's license, smokes a pack and a half to two packs of cigarettes a day, and has a history of substance abuse. [Dkt. 11-22 at 34, 39-40 (R. 1156, 1161-62); Dkt. 11-2 at 71-74 (R. 70-73).] She previously worked as a car detailer, fast food worker, greeter, and house

cleaner. [Dkt. 11-22 at 35-36 (R. 1157-58).] The Plaintiff alleges that her mental and physical impairments prevent her from working full time. *Id.*

### B. Medical History

On June 20, 2006, Adult & Child Mental Health Center referred the Plaintiff to Richmond State Hospital because "she posed a risk of violence against herself." [Dkt. 11-9 at 2 (R. 352).] Upon admission, Plaintiff was irritable and complained that she suffered from bi-polar disease, substance abuse problems, and anger issues. [*Id.*] Reviewing her medical history, Dr. Adrian Villarin discovered that the Plaintiff was, at age nine, diagnosed with attention deficit/hyperactivity disorder ("ADHD") and at age thirteen, she started using marijuana and eventually crack cocaine. [*Id.*] Even though Dr. Villarin noted that the Plaintiff had poor compliance with treatment, on September 22, 2006, Plaintiff was discharged to the care of her mother in an "improved" mental state. [*Id.*] Dr. Villarin diagnosed the Plaintiff with mixed bipolar disorder, polysubstance dependence, and ADHD. [*Id.*]

In March 2009, the Plaintiff was again hospitalized for an "[u]nspecified episodic mood disorder." [Dkt. 11-11 at 3 (R. 546).] She was admitted to Community North Hospital on immediate detention after being arrested. [Dkt. 11-11 at 9 (R. 553).] The Plaintiff was diagnosed by Dr. Thomas E. Kreider with severe benzodiazepine dependence, borderline personality disorder, alcohol abuse, recurrent severe major depression without psychosis, and a nicotine dependence. Dr. Kreider also noted the Plaintiff's history of cocaine dependence. [Dkt. 11-11 at 9 (R. 553).] The Plaintiff was discharged after twelve days in the hospital with the

medical staff noting that she had made "some improvement." [Dkt. 11-11 at 9-11 (R. 553-55).]

In August 2011, Plaintiff sought treatment at Lincoln Behavioral Services in Redford, Michigan. [Dkt. 11-9 at 83-86 (R. 433-36).] There, she complained of angry and violent manic episodes, substance abuse, anxiety, and a history of panic attacks and suicidal ideations. [*Id.*] She was diagnosed with bipolar disorder, type I, early partial remission polysubstance abuse and a Global Assessment Functioning ("GAF") score of 47.[2] [*Id.*] It appears the Plaintiff discontinued services in December 2012.

On March 29, 2013, Plaintiff visited Dr. Terrence A. Mills, a state consultative psychological examiner, for a psychological exam. [Dkt. 11-10 at 91 (R. 536).] Plaintiff reported that she had a history of bipolar disorder, ADHD, oppositional defiant disorder, anger issues, and panic disorder. [*Id.*] She indicated that she had been prescribed several medications for her ADHD in the past, but none of them had worked. [*Id.*] She also stated that she could not concentrate without her medication and lost her previous jobs because of her difficulty concentrating. [Dkt. 11-10 at 92 (R. 537).] At the time of this examination, she was not taking any medication because she was pregnant. [Dkt. 11-10 at 91 (R. 536).]

Dr. Mills opined that Plaintiff suffered from mood swings, sleep deprivation, anger issues, ADHD, panic attacks and a poor ability to concentrate. [Dkt. 11-10 at

---

[2] "The GAF score is a numeric scale of 0 through 100 used to assess severity of symptoms and functional level." *Yurt v. Colvin*, 758 F.3d 850, 861 n. 2 (7th Cir. 2014) (citing *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. text revision 2000)).

93 (R. 538).] He further opined that it did not appear that the Plaintiff could do work related activities. [*Id.*] Ultimately, Dr. Mills diagnosed her with mixed bipolar disorder, ADHD, panic disorder, moderate issues with social functioning, and a GAF score of 45-50. [*Id.*]

In May 2013, Plaintiff returned to Lincoln Behavior Services to resume counseling. [Dkt. 11-11 at 48 (R. 592).] At intake, the Plaintiff indicated that she had stopped attending counseling because she had moved to Indiana, where her boyfriend lived. [*Id.*] The counselor at intake noted that the Plaintiff had been off her medication since November 30, 2012, and she appeared a little hypo-manic during the intake. [*Id.*]

That same month, Dr. Rom Kriauciunas, state-agency reviewing psychologist, reviewed Plaintiff's medical records. [Dkt. 11-3 at 29-42 (R. 112-125).] He opined that the Plaintiff was moderately limited in her ability to comprehend and recall complex directions, concentrate and complete complex assignments, maintain socially acceptable behavior, and adapt to changes on a job. [Dkt. 11-3 at 38-39 (R. 121-22).] Dr. Kriauciunas concluded that Plaintiff's mental impairments did not, however, significantly limit her ability to perform simple, low-stress, unskilled work on a sustained basis. [Dkt. 11-3 at 40 (R. 123).]

The Plaintiff visited Lincoln Behavior Services again in September 2013. There, Dr. Mohamed Siddique completed a progress note and stated that the Plaintiff continued to suffer from bipolar disorder and generalized anxiety disorder. [Dkt. 11-11 at 45-46 (R. 589-90).] Dr. Siddique also indicated that the Plaintiff had

not been taking her medication, but wanted to get back on them because she was experiencing significant anxiety and mood swings. [Dkt. 11-11 at 46 (R. 590).] At that time, Dr. Siddique gave the Plaintiff a two month prescription for various medications. [Dkt. 11-11 at 45 (R. 589).] Two months later, Dr. Siddique performed a full psychiatric evaluation of the Plaintiff because she continued to complain of mood swings, depression, irritability, explosive outbursts, inattention, anxiety attacks, and poor sleep. [Dkt. 11-13 at 8 (R. 684).] Dr. Siddique found that the Plaintiff's memory was intact, that she was aware, and had fair judgment. [Dkt. 11-13 at 10 (R. 686).] He also found that she was distractible, irritable, and had racing thoughts. [*Id.*] Dr. Siddique diagnosed Plaintiff with severe mixed bipolar disorder, panic disorder with agoraphobia, inattentive ADHD, and generalized anxiety disorder. [Dkt. 11-13 at 11 (R. 687).] He designated a GAF score of 46 and issued a prognosis of guarded, but fair with treatment. [*Id.*] He also noted that, in the past, Plaintiff did better on a different medication regimen, and, accordingly, gave her prescriptions for those medications. [Dkt. 11-13 at 9, 11 (R. 685, 687).]

On November 21, 2013, Plaintiff was admitted to St. Mary Mercy Livonia Hospital for what appeared to be a manic episode. [Dkt. 11-14 at 3-5 (R. 693-95).] Dr. Nabila Farooq was the attending physician and, upon admission, started providing Plaintiff with supportive psychotherapy and placed her back on her prescribed medication with additional medication for her anxiety. [Dkt 11-14 at 8 (R. 698).] Plaintiff was hospitalized for five days and indicated that she had not been taking her medications because she feared that the side effects would affect

9

her ability to care for her children. [Dkt 11-14 at 5-6 (R. 695-96).]  At discharge, she was found to be in a good mood, with normal attention and concentration. However, she was diagnosed with bipolar disorder, type I and also found to have impaired insight and judgment. [*Id.*; Dkt. 11-14 at 4 (R. 694).]

Plaintiff returned to Dr. Siddique in January 2014 for more treatment. [Dkt. 11-19 at 24 (R. 994).] At that time, she reported that she still had mood swings, racing thoughts, irritability, and was exercising poor judgment. [Dkt. 11-19 at 25 (R. 995).] Based on these complaints, Dr. Siddique altered Plaintiff's medications to include Seroquel XR, for her bipolar disorder, Haldol, for excitement in her brain, and increased Intrinic, for her ADHD. [*Id.*]

At the end of March 2014, Plaintiff was admitted to Oakwood Hospital Emergency Room after attempting suicide by overdosing on Seroquel and Haldol— her newly prescribed medications. [Dkt. 11-18 at 35 (R. 932).] After being released from the hospital, she was admitted to Samaritan Behavioral Center in Detroit, Michigan, under the care of Dr. Daniel M. Appel. [*Id.*] There, Dr. Appel observed that Plaintiff was labile and impulsive, had average intelligence, fair insight, and poor judgment. [*Id.*] He also found her cognition and memory to be intact. [*Id.*] Plaintiff told Dr. Appel that she attempted suicide because Child Protective Services had taken her kids away in January of 2014 and she had just had a fight with her then-boyfriend. [*Id.*]

Over the course of her five day hospitalization, her medications were altered frequently but eventually a regimen was established. [*Id.*] During her time in the

hospital, it was noted that she showed improvement in her pressured speech, flight of ideas, mania, agitation, lability, and impulsivity. [Dkt. 11-18 at 35-36 (R. 932-33).] She stated that her new medicine was helpful, and Dr. Appel noted that there was no indication of side effects from it. [Dkt. 11-18 at 35 (R. 932).] On April 4, 2014, Plaintiff was discharged and diagnosed with severe depressed bipolar disorder, post-traumatic stress disorder ("PTSD"), cannabis abuse, cocaine abuse in remission, and borderline personality disorder. [Dkt. 11-18 at 36 (R. 933).] Dr. Appel designated her a GAF score of 30 and indicated a guarded prognosis.

On July 17, 2014, the Plaintiff returned to Dr. Siddique at Lincoln Behavioral because she did not like the new medications that she was on. [Dkt. 11-21 at 5 (R. 1121.] She requested to be put back on Seroquel and Haldol. Dr. Siddique's warned her about the possible side effects of making this change, but, nevertheless, she "insisted" on the change. [*Id.*]

Plaintiff's next psychological assessment was in late December 2015 at Lincoln Behavior Services. [Dkt. 11-28 at 64-80 (R. 1513-1529).] There, she complained of anxiety, manic episodes, periods of depression, mood swings, and panic attacks. [Dkt. 11-28 at 66 (R. 1515).] She also indicated that she was having trouble sleeping and difficulty concentrating. [*Id.*] The intake assessment from Lincoln Behavioral indicated that the Plaintiff was anxious to receive medication because she believed the medication made her more stable and she wanted to ensure her stability for an upcoming Child Protective Services matter. [*Id.*] At this intake, the Plaintiff reported that she had either used drugs or misused prescription

drugs twenty times in the last three months. [Dkt. 11-28 at 68 (R. 1517).] Ultimately, Plaintiff was diagnosed with mixed severe bipolar disorder, panic disorder with agoraphobia, and ADHD. [Dkt. 11-28 at 79 (R. 1528).] She was given a GAF score of 48, and the counselor, Mr. McMinn, recommended consistent treatment with intensive community based services. [Dkt. 11-28 at 79-80 (R. 1528-29).]

In February 2016, Plaintiff began reporting to Southwest Counseling in Detroit, Michigan, because she was no longer happy with her care at Lincoln Behavioral. [Dkt. 11-29 at 27 (R. 1555).] Again, she complained of mood problems, panic attacks, concentration problems, and recurring anger issues. [*Id.*] She also indicated that she would cut herself when she got upset. [*Id.*] She reported, however, that she had been off of her medications for two years, and that she was more stable and rational when she was on medication. [*Id.*] Ultimately, Dr. Jaswant S. Purohit diagnosed her with moderate bipolar disorder, PTSD, panic disorder without agoraphobia, intermittent explosive disorder, and ruled out borderline personality disorder. [Dkt. 11-29 at 29 (R. 1557).] Dr. Purohit also started Plaintiff on a different medication regimen. [Dkt. 1-29 at 28 (R.1556).]

On March 11, 2016, Plaintiff followed up with Southwest Counseling and saw Dr. Ratnakar S. Pai. [Dkt 11-29 at 21-26 (R. 1549-1554).] Plaintiff indicated that her issues with mood swings had not improved and that she still got angry, irritable, and anxious. [Dkt 11-29 at 21 (R. 1549).] Dr. Pai increased her dosage of Hydroxyzine, prescribed her Depakote, and instructed her to return to Southwest

Counseling in a month. [Dkt 11-29 at 21, 26 (R. 1549, 1554).] In April 2016, Plaintiff returned and continued to complain about her depression and the side effects of her medication. [Dkt 11-29 at 16 (R. 1544).] Based on these continued complaints, Dr. Pai discontinued Depakote and prescribed Trazodone as an anti-depressant. [*Id.*] Again, Plaintiff was instructed to return in a month. [Dkt 11-29 at 20 (R. 1548).] The Plaintiff, however, failed to return. During both of the above visits, the Plaintiff was observed as being cooperative, exhibiting logical and coherent thought processes, and appropriate thought content. [Dkt. 11-29 at 18-19, 24-25 (R. 1546-47, 1552-53).]

In July 2016, Plaintiff was evaluated by psychological consultative examiner Dr. Ibrahim Youssef. [Dkt. 11-29 at 3-8 (R. 1531-36).] Dr. Youssef noted that the Plaintiff's psychiatric symptoms dated back to her childhood when she was diagnosed with ADHD. [Dkt. 11-29 at 3 (R. 1531).] The Plaintiff informed Dr. Youssef that she was first hospitalized at age sixteen and since then had more than thirty-eight re-hospitalizations. [*Id.*] The Plaintiff admitted that she wanted to feel manic and did not always comply with her medications. She indicated that she was on a medication regimen, but did not think the regimen was helpful. [*Id.*]

Dr. Youssef noted that Plaintiff's contact with reality was mildly intact, she had no self-esteem, was not pleasant, and had very partial insight. [Dkt. 11-29 at 4 (R. 1532).] He also found Plaintiff to be irritable, angry, anxious, hostile, and her affect to be constricted. [*Id.*] He observed that she had "mild flight of ideas, but was redirectable." [*Id.*] Dr. Youssef diagnosed Plaintiff with bipolar disorder, type I,

correctly mixed of moderate nature; borderline personality disorder; history of drug abuse; and a poor prognosis. [Dkt. 11-29 at 4-5 (R. 1531-33).]

In connection with this evaluation, Dr. Youssef completed a medical source statement, which indicated that the Plaintiff had mild limitations understanding, remembering, and carrying out simple instructions; moderate limitations when it came to making judgments on simple work-related decisions and understanding and remembering complex instructions; and marked limitations making judgments on complex work-related decisions and carrying out complex instructions. [Dkt. 11-29 at 6 (R. 1534).] Dr. Youssef also indicated that the Plaintiff had marked limitations interacting with the public, supervisors, co-workers, and responding appropriately to usual work place situations and changes in a routine. [Dkt. 11-29 at 7 (R. 1535).] In his report, Dr. Youssef stated that the Plaintiff was able to manage her benefit funds. [Dkt. 11-29 at 5 (R. 1533).] However, in his medical source statement, he indicated that she was not able to manage her funds in her own best interest. [Dkt. 11-29 at 8 (R. 1536).]

**C. ALJ Decision**

In determining whether the Plaintiff qualified for disability benefits under the Act, the ALJ went through the five-step analysis required by 20 C.F.R. § 404.1520(a). At step one, the ALJ found that the Plaintiff was unemployed and had not engaged in substantial gainful activity since January 18, 2013. [Dkt. 11-22 at 8 (R. 1130).] At step two, the ALJ determined that the Plaintiff suffered from the severe impairments of bipolar disorder, type I, PTSD, borderline personality

disorder, intermittent explosive disorder, cocaine dependence, and scoliosis. [*Id.*] At step three, the ALJ concluded that none of her impairments or combination of her impairments met or medically equaled the severity of one of the listed impairments. [Dkt. 11-22 at 8-10 (R. 1130-32).]

Next, the ALJ found that the Plaintiff had the residual functional capacity ("RFC") to perform sedentary work except that "she require[d] work with a sit/stand option with the opportunity to alternate between sitting and standing; can never climb ladders, scaffolds, or ropes, kneel, or crawl; can occasionally bend, twist, and turn at the waist." [Dkt. 11-22 at 10 (R. 1132)]. "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations," and "must be assessed based on all of the relevant evidence in the record." *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004); *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations.")  The ALJ also limited Plaintiff "to simple, routine, repetitive tasks in an environment free of fast pace production requirements, involving few, if any, workplace changes; no public interaction, and only occasional interaction with coworkers." [*Id.*] At Step Four, the ALJ found that Plaintiff had no past relevant work. [Dkt. 11-22 at 18 (R. 1140).] At Step Five, given Plaintiff's age, education, work experience, and residual functional capacity, and based on the vocational expert's testimony, the ALJ found that the Plaintiff was able to perform work that existed in significant numbers in the national economy.

15

Therefore, the ALJ concluded that she was not disabled. [Dkt. 11-22 at 19 (R. 1141).]

**D. Analysis**

Plaintiff presents three arguments challenging the ALJ's decision at Steps Four and Five of the disability determination analysis. The Court will address each argument in turn.

> a. *The ALJ's Residual Functional Capacity Determination Considers the Opinions of the Consultative Psychological Examiners*

First, the Plaintiff alleges that the ALJ's residual functional capacity ("RFC") is not supported by substantial evidence because the ALJ allegedly failed to consider the opinions of two consultative psychological examiners, Dr. Terrance Mills and Dr. Ibrahim Youssef.  When crafting a claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001).

The Plaintiff's argument that the ALJ failed to give *any* consideration to the opinion of Dr. Terrance Mills is without merit. As demonstrated in the record, the ALJ reviewed Dr. Mills's opinion and, in fact, gave it some weight when formulating the RFC. [Dkt. 11-22 at 18 (R. 1140).] The ALJ noted, however, that when the Plaintiff was examined by Dr. Mills in March 2013, "she was not taking any medication for mental illness because she was pregnant" and that "she could not concentrate without her medications." [*Id.*] Without the Plaintiff being on her medication during Dr. Mills's examination, the ALJ appears to discredit Dr. Mills's determination that the Plaintiff could not manage her benefit funds due to poor

math skills. The ALJ noted that Dr. Mills's examination "revealed some moderate issues with social functioning and maintaining concentration, persistence, and pace." *Id.* In assessing the RFC, taking Dr. Mills's opinion into account, the ALJ found that the Plaintiff's suffered from moderate mental limitations. [*Id.*]

Next, the Plaintiff contends that the ALJ rejected the consultative opinion of Dr. Ibrahim Youssef when crafting her RFC. In his Medical Source Statement, Dr. Youssef concluded that the Plaintiff had "marked" limitations[3] interacting appropriately with the public, supervisors, and co-workers. [Dkt. 11-29 at 7 (R. 1535).] Relying on this finding, the Plaintiff maintains that the ALJ erred in his RFC finding that she could interact occasionally with co-workers.

When determining an individual's RFC, the ALJ must consider all relevant evidence in the record. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Thus, the question for the Court is whether the ALJ's determination of the Plaintiff's RFC is supported by substantial evidence. [*Id.*]  The ALJ did not ignore Dr. Youssef's opinion as the Plaintiff maintains, but rather considered it in light of all of the other evidence before him. In considering the weight to give Dr. Youssef's opinion that the Plaintiff had serious limitations interacting with co-workers, the ALJ considered Dr. Youssef's finding that the Plaintiff only had mild[4] limitations understanding

---

[3] On the Social Security Administration Medical Source Statement of Ability to Do Work-Related Activities form, a "marked" rating is defined as a "serious limitation" and a "substantial loss in the ability to effectively function."

[4] On the Social Security Administration Medical Source Statement of Ability to Do Work-Related Activities form, a "mild" rating is defined as a "slight limitation" and that the "individual can generally function well."

and carrying out simple instructions, and moderate[5] limitations making judgments on simple work-related decisions and carrying out complex instructions. [Dkt. 11-29 at 6 (R. 1534).] These milder limitations support the ALJ's finding that the Plaintiff could maintain simple work activity because they show that the Plaintiff can take directions from those that she works with and maintain some kind of working relationship with others, particularly supervisors.

Moreover, as demonstrated throughout his opinion, the ALJ discussed evidence that showed that the Plaintiff's mental conditions and interactions with others improved when she was on her medications. For instance, in February and August 2016, at both Lincoln Behavioral and Southwest Solutions, it was reported that the Plaintiff responded well to her medications. [Dkt. 11-22 at 16 (R. 1138).] Moreover, the Plaintiff herself acknowledged multiple times that her medications helped her, and she specifically sought them to be more stable for a Child Protective Services matter. During a number of visits, she reported that she had good focus and better self-esteem, and she was observed as friendly and cooperative when she was on her medication. [*Id.*] In fact, at a December 2015 appointment at Lincoln Behavioral, it was noted that the Plaintiff "is a people person as long as she is stable on medication." [Dkt. 11-28 at 67 (R. 1515).] Notably, on March 7, 2013, the Plaintiff completed a Function Report where she admitted that she had to "force herself to take medication because she did not like feeling normal." [Dkt. 11-22 at

---

[5]  On the Social Security Administration Medical Source Statement of Ability to Do Work-Related Activities form, a "moderate" rating is defined as "more than a slight limitation" and "the individual is still able to function satisfactorily."

12 (R. 1133).]  In addition, the ALJ reviewed a third-party function report which was completed by the Plaintiff's grandmother, who observed that the Plaintiff "was always taking on her phone, and that she had lost [her] job because she could not keep up with pace because she was always talking to others." [*Id.* at 12.] This evidence suggests that the Plaintiff's interactions with others were highly dependent on her choice to take her medications.

The ALJ also considered the testimony of the Plaintiff when assessing her RFC. The Plaintiff testified that she "did not take medications for her bipolar because she felt more normal being manic." [Dkt. 11-22 at 11 (R. 1133).] Moreover, the Plaintiff admitted to enjoying visits with friends, but "did not grocery shop because she did not deal well with people." The Plaintiff reported, however, socializing with a friend, the ability to go out alone and shop, to grocery shop with her mother, and to attend Narcotics Anonymous group meetings which would require minimal interaction with others. [*Id.* at 9 (R. 1131).]

Taken together, both the medical and relevant nonmedical evidence, the ALJ's determination that the Plaintiff could not have interactions with the public, but occasional interaction with co-workers is supported by the record. There is more than a scintilla of evidence in support of his findings, and a reasonable person could conclude that it supports his decision. *See Rice*, 384 F.3d at 369; *Wood*, 246 F.3d at 1029.

### b. Alleged Conflict in Vocational Expert's Testimony

Plaintiff's second argument is that the ALJ erroneously relied on the vocational expert's testimony because it conflicted with the Dictionary of Occupational Titles ("DOT"). She argues that the vocational expert ("VE") testified Plaintiff could perform quota based jobs, but that the jobs the VE identified, based on the Dictionary of Occupational Titles and O*NET[6], are production paced jobs.

At the hearing, the ALJ gave the following hypothetical to the VE:

> [A]ssume a hypothetical individual to meet the demands of sedentary work. [The] [i]ndividual should never use ladders, scaffolds, ropes, kneel or crawl, should have the opportunity to alternate between sitting and standing every 30 minutes. She'd only occasionally bend, twist or turn at the waist. She'd have only simple, routine, repetitive work in an environment free from production requirements, involving few if any workplace changes, no public interaction and only occasional interaction with coworkers.

[Dkt. 11-22 at 51 (R. 1173).] Based on this hypothetical, the VE testified that Plaintiff could perform sedentary, unskilled jobs such as a sorter and a bench assembler. [Dkt. 11-22 at 52 (R. 1174).]

After the ALJ elicited this testimony, Plaintiff's counsel questioned the VE further and raised concerns that these jobs were not free from production requirements. [Dkt. 11-22 at 52-55 (R. 1174-77).] During this questioning by counsel, the VE testified that the jobs she identified were quota based jobs, rather than production paced jobs. [Dkt. 11-22 at 53 (R. 1175).] The VE explained that

---

[6] The O*NET database, like the Dictionary of Occupational Titles, provides specific and standardized descriptions regarding occupations.

production paced jobs are similar to assembly line jobs where an employee works with other employees on either side and only has a few seconds to perform her part before handing off a product to the next person in the line (i.e., the individual is responsible for keeping the line moving.) The VE went on to explain that quota based jobs, on the other hand, require an individual to remain on task and complete a certain number of tasks throughout the day, but that the individual can do the job at her own pace. [Dkt. 11-22 at 53-55 (R. 1175-77).]

After the hearing, Plaintiff's counsel conducted further research into the jobs identified by the VE and discovered that, in some instances, the jobs use conveyor belts. Plaintiff's counsel submitted this information to the ALJ before the unfavorable decision was issued. Plaintiff argued to the ALJ then, and now here to the District Court, that because the DOT and O*NET descriptions of these jobs reference the use of a conveyor belt, these jobs should be considered production paced jobs and, therefore, jobs that Plaintiff cannot perform. In response, the Commissioner argues that Plaintiff is erroneously equating any job involving the use of a conveyor belt with a production paced job.

The Plaintiff's argument is unpersuasive for several reasons. First, the Plaintiff cites no authority for her assertion that the use of a conveyor belt automatically makes a job a production paced job. Moreover, the descriptions of these jobs make no mention of workers being dependent on one another, interacting frequently, or passing parts along to other employees. Additionally, the O*NET and DOT descriptions do not indicate that a conveyor belt is *required*. In fact, the DOT

description of bench assembler does not even mention a conveyor belt. Lastly, and perhaps most importantly, the VE testified that, based on her opinion as an expert, these jobs were not assembly line or production paced jobs. Other than counsel's own interpretation of the DOT and O*NET descriptions, Plaintiff presents no authority or evidence that calls the VE's expert testimony into question. The ALJ's reliance on the VE's expert testimony, therefore, is supported by substantial evidence in the record.

    *c.*   *The ALJ's Residual Functioning Capacity Determination and Hypothetical Question to the Vocational Expert Fails to Consider the Plaintiff's Mental Limitations*

Plaintiff alleges that the ALJ's RFC and hypothetical posed to the VE fails to account for all of her mental limitations which the ALJ attributed to her at Step Three of his sequential analysis [Dkt. 11-22 at 9-10 (R. 1131-32).] As detailed above, Dr. Kriauciunas, the state agency's psychological consultant, noted on the Mental Residual Functional Capacity Assessment ("MRFCA") form that the Plaintiff suffered from "moderate" limitations in areas of concentration and persistence. [Dkt. 11-3 at 38-39 (R. 121-22).] These limitations included moderate limitations in the ability to carry out detailed instructions and the ability to maintain attention and concentration for extended periods of time. The Plaintiff was not, however, limited in her ability to carry out very short and simple instructions, perform within a schedule, be punctual, work with or in close proximity to others without being distracted, or complete a normal workday or workweek.

"As a general rule both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record," *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014), including limitations in concentration, persistence, and pace. *Varga v. Colvin*, 794 F.3d 809, 813-14 (7th Cir. 2015); *Yurt*, 758 F.3d at 857. "Although it is not necessary that the ALJ use this precise terminology ('concentration, persistence and pace'), [the Court] will not assume that the VE is apprised of such limitations unless she has independently reviewed the medical record." *Yurt*, 758 F.3d at 857. If, there is no evidence that the VE reviewed the Plaintiff's medical records or heard testimony about the various medical limitations, the Court would expect an adequate hypothetical to include limitations identified by the consultative psychological examiners. *Id.*

Here, the medical evidence in the record shows that Plaintiff has moderate limitations maintaining concentration, persistence, and pace. In March 2013, Dr. Mills opined that the Plaintiff "has trouble concentrating of any length of time [and] . . . has lost jobs because of her inability to attend and concentrate." [Dkt. 11-10 at 93 (R. 538).] A few months later, in May 2013, Dr. Kriauciunas, found that the Plaintiff had a moderately limited ability to carry out detailed instructions and to maintain attention and concentration for extended periods of time. [Dkt. 11-3 at 38-39 (R. 121-22).] Overall, Dr. Kriauciunas concluded that the Plaintiff was moderately limited in her ability to concentrate and to complete complex assignments. [*Id.* at 39 (R. 121).] In the "additional explanation" text box, Dr.

23

Kriauciunas concluded that the Plaintiff's mental impairments did not significantly limit the Plaintiff's ability "to perform simple, low-tess [sic][7], unskilled work on a sustained basis." [*Id.* at 40 (R. 123).] Finally, in July 2016, Dr. Youssef completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) form for the Plaintiff and placed checkmarks in boxes to indicate that the Plaintiff had "moderate" to "marked" difficulties in several areas relating to Plaintiff's mental ability to do work related activities, including her (1) ability to make judgments on simple work-related decisions, (2) understand and remember complex instructions, (3) carry out complex instructions, and (4) ability to make judgements on complex work-related decisions. [Dkt. 11-29 at 6-7 (R. 1534-35).]

Here, there is no evidence that the VE reviewed the Plaintiff's medical history or heard testimony about the various medical limitations that the Plaintiff complains were omitted from the ALJ's hypothetical. Thus, the Court should expect an adequate hypothetical to include the limitations identified by Drs. Mills, Kriauciunas and Youssef.

In his decision, the ALJ appears to concur with Dr. Kriauciunas's mental assessment that the Plaintiff had moderate difficulties with concentration, persistence or pace, and incorporated them in Step Three of his sequential analysis. [Dkt. 11-22 at 9 (R. 1131-32).]  The ALJ did not, however, include these difficulties in his RFC or address them in his hypothetical question to the vocational expert. By failing to incorporate all of the claimant's limitations – including moderate

---

[7] The Court is interpreting this to be a typographical error that should have read "low-stress."

limitations in concentration, persistence, or pace – the ALJ committed reversible error. *Varga*, 794 F.3d at 814.

The Commissioner seems to suggest that the ALJ's residual functional capacity determination does in fact take into account all of the Plaintiff's mental limitations because the ALJ determined that the Plaintiff could perform "a reduced range of sedentary work subject to additional limitations including 'simple, routine, repetitive tasks.'" (Comm'r Br. at 21.) However, the Seventh Circuit has routinely found that these terms define "unskilled work," but do not address the underlying question of whether a person with mental impairments in the areas of concentration, persistence or pace could perform such work. *Varga*, 794 F.3d at 814. As the Court explained in *Varga*, these terms alone do not capture an individual's mental limitations. *Id.* For this reason, the Seventh Circuit has rejected the notion that an RFC like the one here, limiting the Plaintiff "to simple, routine, repetitive tasks in an environment free of fast pace production requirements" accounts for a claimant's mental impairments. *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008). The ALJ failed to provide an "accurate and logical bridge" between his recitation of the mental medical evidence and the decision to account for the Plaintiff's mental impairments by limiting her to unskilled work.

Like the Commissioner in *Varga* and *Yurt*, the Commissioner here relies on *Johansen v. Barnhart*, 314 F.3d 283 (7th Cir. 2002), to argue that the ALJ did not need to mention the Plaintiff's mental impairments in his hypothetical to the VE because the ALJ relying on the narrative portion of the MRFCA adequately

25

captured the Plaintiff's moderate limitations in the area of concentration, persistence or pace.

In *Johansen,* the Seventh Circuit concluded that substantial evidence supported the denial of disability benefits where the ALJ's mental RFC assessment and hypothetical to the VE failed to explicitly state the three areas where one consultative physician had noted that the claimant was "moderately limited." *Id.* at 288-89. The three alleged omissions from the hypothetical in *Johansen* were moderate limitations in the Plaintiff's ability to (1) perform activities within a schedule; (2) complete a normal workweek and perform at a consistent pace; and (3) accept instructions and respond appropriately to criticism. *Id.* at 286.  The ALJ's decision was upheld despite these omissions because the consultative physician "went further" and "translated" his findings into a specific RFC assessment opining that the claimant was still able to perform low-stress, repetitive work. *Id.* Additionally, subsequent decisions have made clear that the hypothetical in *Johansen* was upheld because the hypothetical would have "excluded positions likely to trigger symptoms of the panic disorder that lay at the root of the claimant's moderate limitations [in] concentration persistence and pace." *O'Connor v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) (emphasis original); *see also Yurt*, 758 F.3d at 858.

Here, the Commissioner contends that Dr. Kriauciunas translated his findings on the MRFCA worksheet in the narrative portion of the assessment form which the ALJ allegedly adopted as his own. As noted above, Dr. Kriauciunas provided that the Plaintiff's mental impairments did not significantly limit the

Plaintiff's ability to perform "simple, low-[str]ess, unskilled work on a sustained basis." [Dkt. 11-3 at 40 (R. 123).] The fatal flaw here, unlike the hypothetical posed in *Johansen*, is that the ALJ failed to incorporate the doctor's narrative findings in his RFC and hypothetical question to the VE. Dr. Kriauciunas's narrative specifically limited the Plaintiff to low-stress positions and this was not included in either the RFC or hypothetical question. Additionally, there is no indication that the hypothetical posed here would have caused the VE to eliminate positions that would be too difficult given the Plaintiff's underlying mental disorders. Because the ALJ's RFC assessment fails to account for all of the Plaintiff's medical limitations, this decision should be remanded.

## IV.    Conclusion

For the reasons detailed herein, the Magistrate Judge recommends that the ALJ's decision be **REVERSED** and **REMANDED**.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. §636(b)(1). Failure to timely file objections within fourteen days after service shall constitute waiver of subsequent review absent a showing of good cause for such failure. Counsel should not anticipate any extension of this deadline or any other related briefing deadlines.

Date: 9/12/2018

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email.

27